IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
    v.                              )   Criminal Action No.
                                    )   06-00102-01-CR-W-DW
JOSE E. CASTELLANOS,                )
                                    )
            Defendant.              )

**REPORT AND RECOMMENDATION TO GRANT IN PART
AND DENY IN PART DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Before the court is defendant's motion to suppress
evidence seized from his residence, truck, and storage unit
on the grounds that police had no legal basis to search
defendant's residence for identification, reliance on
consent to search the storage locker was unreasonable, and
the search of his truck incident to arrest was not done
contemporaneously with his arrest.  I find that the law
enforcement officers lawfully stopped defendant, lawfully
detained defendant, lawfully entered defendant's residence,
lawfully searched for his identification, and lawfully
searched the storage locker; therefore, defendant's motion
to suppress evidence found in the residence and the storage
locker should be denied.  However, I find that the search of
defendant's truck was not incident to arrest, and therefore
the evidence found inside the truck should be suppressed.

## I.  BACKGROUND

On February 23, 2006, law enforcement officers went to defendant's residence after obtaining information that he was in the country illegally, was selling drugs from his residence, and a relative of his had been kidnaped and police had information that the man may have been murdered. When they were on defendant's porch, he drove up and, after seeing the police, backed out and left.  He was pulled over two blocks away after police observed him weaving. Defendant was drunk.  He was taken back to his residence where he had stated his identification was located.  While looking for the i.d., police saw in plain view several documents which appeared to be ledgers of drug sales.  They used that information to obtain a search warrant for the residence.  While executing the search warrant, they found a receipt for a storage locker in the name of Teresa Wilkerson.  Ms. Wilkerson consented to a search of the storage locker, and police recovered a stolen car containing methamphetamine.  Defendant's truck was searched and police recovered two guns and two magazines.

On March 15, 2006, an indictment was returned charging defendant with one count of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 846; one count

2

of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); one count of possessing firearms and ammunition while in the United States illegally, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2); one count of unlawful reentry into the United States after having been deported, in violation of 8 U.S.C. § 1326(a); and one count of criminal forfeiture, pursuant to 21 U.S.C. § 853. Defendant filed the instant motion to suppress on April 10, 2006 (document number 20). The government filed a response to the motion on April 20, 2006 (document number 27). On April 25, 2006, I held an evidentiary hearing on defendant's motion to suppress. The government appeared by Assistant United States Attorney Kate Mahoney. The defendant was present, represented by Assistant Federal Public Defender Steve Moss. The following witnesses testified:

1.  Detective Luis Ortiz, Kansas City, Missouri, Police Department.

2.  Special Agent Tracy Raggs, Immigration and Customs Enforcement.

3.  Detective Don Stanze, Kansas City, Missouri, Police Department.

4.  ATF Special Agent Christopher Allen.

In addition, the following exhibits were marked and admitted into evidence:

    P. Ex. 1    Copy of affidavit for search warrant, search warrant, and return.

    P. Ex. 2    Receipt for a public storage unit.

    P. Ex. 3    Consent to search form, signed by Teresa Wilkerson.

    P. Ex. 4    Rental agreement for storage unit showing Teresa Wilkerson as the person renting the unit.

    P. Ex. 5    Application and affidavit for search warrant for storage locker, warrant, and return.

## II.    EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1.    In May of 2005, Jesus Cardenas was arrested after police had obtained information from a confidential informant (Tr. at 4, 40). After the arrest of Cardenas, the informant continued to give police information which has always proven to be accurate (Tr. at 4, 5, 20, 40). During the past year, this informant has been providing information about "Fish" or "Pescado" which means fish in Spanish (Tr. at 6, 18). The informant described Fish as a Hispanic male who has been selling illegal drugs for a long time, and he

4

supplies other drug dealers in Kansas City (Tr. at 6). The informant stated that Fish is in the country illegally and he sells large quantities of methamphetamine (Tr. at 6). The address provided by the informant was 4900 Raytown Road, Lot number 216, and the informant said defendant drives a green pickup truck (Tr. at 6-7, 10).

2. Detective Ortiz conducted surveillance on that address and gathered information for a long period of time (Tr. at 7). On February 22, 2006, Detective Ortiz received information that a member of defendant's family, Francisco Rodriguez, who had been kidnaped the previous week, had been killed[1] (Tr. at 7). On February 23, 2006, Detective Ortiz decided to go to defendant's residence to investigate the possible murder, which he believed related to drug trafficking (Tr. at 7, 19).

3. Detective Ortiz went to defendant's residence at approximately 6:15 a.m. on February 23, 2006 (Tr. at 8, 84). He was accompanied by five other law enforcement officers, one of whom was Special Agent Tracy Raggs from Immigration and Customs Enforcement (hereinafter referred to as "ICE") because of the allegation that defendant was in the country

_____

[1]A few days later, Rodriguez's body was found in Kansas City, Kansas, along with another body (Tr. at 7-8).

illegally (Tr. at 8, 41).

4.    When the officers arrived at the trailer, they knocked on the door and noticed that it was partially open (Tr. at 8, 9).  No one answered the knock, and they could not see anyone inside (Tr. at 8).  Sergeant Pruetting and Detective Bax saw a neighbor and talked to the neighbor who said there is always traffic in and out of defendant's trailer, but for the past week or so, no one had been seen going in or out (Tr. at 9).  The officers decided to check the trailer to make sure there was no one dead inside, because of the information about Rodriguez having been killed (Tr. at 9, 84).  They went inside, did not see anyone, and immediately exited the residence (Tr. at 9). They were inside the residence about 30 seconds to one minute (Tr. at 85).  As they were exiting the porch area, the officers observed defendant driving a green pickup truck pulling into the parking space to lot 216 (Tr. at 10, 41). Defendant saw the officers at the porch, some of whom were wearing vests with "POLICE" on them, and he backed the truck up and drove away (Tr. at 10, 41).  Detective Ortiz recognized defendant (Tr. at 10, 41).

5.    Special Agent Tracy Raggs of ICE decided to conduct a traffic stop based on the information that

6

defendant was in the United States illegally (Tr. at 10, 41). He observed defendant driving his truck, weaving while he was driving (Tr. at 55). Special Agent Raggs and Detective Ortiz stopped defendant about a block and a half to two blocks from the trailer (Tr. at 60, 85). At first defendant refused to identify himself, instead he said, "Just arrest me" (Tr. at 55, 56). Defendant eventually identified himself as Guillermo Lujan, date of birth March 4, 1976 (Tr. at 11, 28, 55). Defendant did not have a driver's license, and he said his identification was at his residence (Tr. at 11, 22, 27, 29, 42). Defendant said he lived up the street (Tr. at 42). Defendant was obviously drunk, he had urinated on himself, and he was stumbling out of the truck (Tr. at 11, 14-15, 55). Detective Ortiz asked for consent to search defendant's truck and residence, but defendant was intoxicated and did not answer (Tr. at 18, 35). The officers suggested they go to defendant's residence to check his identification to make sure he was in the country legally (Tr. at 30). They told defendant they were going to take him back to his residence (Tr. at 42).

6.    Special Agent Raggs and Detective Ortiz drove defendant back to his residence to get his identification (Tr. at 11, 59). Someone drove defendant's truck back to

7

the residence (Tr. at 86). Defendant was handcuffed while
in the  police car pursuant to police policy (Tr. at 15,
57). As soon as they got to the front porch, defendant's
handcuffs were removed (Tr. at 16, 31). Defendant opened
the door which was unlocked and he walked inside (Tr. at
43). Special Agent Raggs and Detective Ortiz followed
defendant inside the residence (Tr. at 12, 16). Defendant
did not object to the officers being in the residence (Tr.
at 12, 31). Defendant sat down on a couch, and then Special
Agent Raggs asked defendant for his immigration status (Tr.
at 12, 16, 43). Defendant refused to say his name (Tr. at
61). Detective Ortiz asked defendant several times for his
name, and he stated that it was "what is on my i.d." (Tr. at
27, 28, 34, 37). Defendant also stated this his name was
Juan, which was different from the first name he provided to
police (Tr. at 27, 28, 37, 61). Special Agent Raggs told
defendant he needed to know what his name was and see his
identification (Tr. at 61). Defendant said his
identification was in his bedroom and waved his hand in the
direction of the bedroom (Tr. at 12, 31, 32, 43, 61).

7. Special Agent Raggs went into defendant's bedroom
and looked on a dresser and a chest, but did not see an i.d.
(Tr. at 32, 44). Lying on top of a dresser was a notebook

8

which had money numbers written on it (Tr. at 45).  Special
Agent Raggs saw similar papers in the living room (Tr. at
45).  Taped to the wall next to the phone in the living room
was a paper which had names, numbers, and money amounts (Tr.
at 45).  It appeared to Special Agent Raggs to be a ledger
for drug transactions (Tr. at 45).  Special Agent Raggs then
saw an i.d. on a bookshelf next to where defendant was
sitting (Tr. at 32).  The identification said Guillermo
Lujan (Tr. at 46, 53).  Special Agent Raggs asked defendant
where he was from, and he said Camargo, Chihuahua, Mexico
(Tr. at 46-47).  Special Agent Raggs asked defendant if he
was legal, and he said he was illegal (Tr. at 47).

    8.  Defendant never objected to Special Agent Skaggs
looking for defendant's identification (Tr. at 49).  It
appeared to Special Agent Skaggs that defendant was not
looking for his identification himself because he was too
drunk (Tr. at 49).

    9.  Defendant was too intoxicated to consent to a
search of his residence, so the officers decided to seek a
search warrant (Tr. at 13, 17).  A warrant was obtained for
the residence authorizing police to search for amphetamines,
weapons, ammunition, currency in close proximity to
narcotics, keys or information about a storage unit, drug

9

paraphernalia, documents related to drug trafficking, and any indicia of occupancy or residency (P. Ex. 1). During the search of defendant's residence, police found $60,000 in U.S. currency, paperwork and a receipt for a storage unit (Tr. at 64). After evidence of drug dealing was found, defendant was placed under arrest for a drug offense and his person was searched incident to arrest (Tr. at 65). Defendant had approximately $1,800 in cash on his person (Tr. at 65).

10. In addition to searching the residence, police searched defendant's truck incident to arrest (Tr. at 80). The truck was searched after defendant had been taken back to the trailer, and while the search warrant for the residence was being executed (Tr. at 80). The search warrant was signed at 9:39 a.m., and the search of the residence began about an hour later (Tr. at 86-87).

11. Police recovered two .9 mm magazines and two pistols (Tr. at 81). The magazines were inside a work glove in the driver's door compartment, and the pistols were concealed inside the center console (Tr. at 81). The guns were underneath a lift-off cup holder (Tr. at 81).

12. ATF Special Agent Christopher Allen and Detective Stanze went to Independence to locate Teresa Wilkerson, the

10

name listed on the storage locker receipt (Tr. at 66, 72).
They advised Ms. Wilkerson that they were investigating
illegal drugs and found this receipt (Tr. at 66). They
asked her for her relationship with defendant and the
storage unit (Tr. at 66). Ms. Wilkerson said she had rented
the storage locker for a person she knew as "Fish" (Tr. at
67, 73, 82). He had asked her to rent the storage unit in
her name, and she believed he would be storing furniture
there (Tr. at 67, 74). Defendant had gone with her to rent
the storage locker and had paid the rental fee (Tr. at 74,
82-83).

13. The officers asked Ms. Wilkerson for her consent
to search the storage locker (Tr. at 67). They did not ask
defendant for his consent, because Ms. Wilkerson's name was
the only one on the receipt for the locker (Tr. at 68). Ms.
Wilkerson went to the storage locker, which was across the
street from defendant's trailer, and she signed a consent to
search form (Tr. at 68; P. Ex. 3). The officers cut the
padlock off because Ms. Wilkerson did not have a key, and
they entered the unit (Tr. at 69, 74-75, 83). They found a
maroon Ford Mustang with no license plates (Tr. at 69). The
VIN established that the car had been stolen and had been
painted from its original black color (Tr. at 69, 70).

11

14. Pursuant to police policy, the stolen car was inventoried and towed to the tow lot (Tr. at 70). During the inventory search, police found a plastic grocery bag behind the driver's seat, and inside were eight individual packages of methamphetamine (Tr. at 70, 76-77). At that point, the inventory search was stopped and the police obtained a search warrant for the car and the storage locker (Tr. at 70).

15. Special Agent Allen spoke to the manager of the storage facility (Tr. at 77-78). He said that the storage unit had originally been in the name of Jesus Magana, then about two months earlier, two Hispanic males and a white female came in and changed the name on the storage unit to Teresa Wilkerson (Tr. at 78). The manager gave Special Agent Allen a copy of the rental agreement (Tr. at 79). The agreement listed Teresa Wilkerson as the person renting the unit, and it provided a space for her to list other individuals who have access to the premises, but that space was blank (Tr. at 79; P. Ex. 4).

16. Four days later, Special Agent Raggs had defendant picked up from the jail and brought to his office (Tr. at 48). Defendant again gave his name as Lujan, but from his fingerprints, Special Agent Raggs learned that his true name

12

was Jose Esteban Castellanos and he had been deported and turned around at the border (Tr. at 49). Defendant admitted his true name and said he had been turned around a couple of times at the border and had used three false names before (Tr. at 49).

### III. LEGAL ANALYSIS

Defendant argues that the police were not authorized to enter and look through his residence for his identification, and that everything following that unconstitutional search is fruit of the poisonous tree.

### A. INITIAL STOP AND DETENTION

To find probable cause to make a warrantless arrest, the facts and circumstances within the officers' knowledge must be sufficient to justify a reasonably prudent person's belief that the suspect has committed or is committing an offense. United States v. Roberson, 439 F.3d 934, 939 (8th Cir. 2006). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001); United States v. Orozco-Castillo, 404 F.3d 1101, 1103 (8th Cir. 2005).

13

In this case, Special Agent Allen observed defendant
weaving in his truck as he drove away from his residence
upon spotting the police. When law enforcement officers
observe a driver weaving in an automobile, they have
reasonable suspicion that the driver is intoxicated and may
conduct a Terry stop. United States v. Slater, 411 F.3d
1003, 1006 (8th Cir. 2005) (citing Terry v. Ohio, 392 U.S. 1
(1968)). Upon stopping defendant's truck, the officers
noted that defendant smelled of alcohol, he stumbled out of
his truck, and it was apparent he had urinated on himself.
At that point, the officers had probable cause to arrest
defendant for driving under the influence of alcohol. See
McNeill v. Wallace, 699 S.W.2d 536 (Mo. App. 1985)
(outlining requirements for establishing probable cause to
arrest for driving under the influence in Missouri). In
addition, defendant stated that he did not have a driver's
license. Therefore, police also had probable cause to
arrest defendant for driving without a license. United
States v. Chauncey, 420 F.3d 864, 871-872 (8th Cir. 2005)
(Existence of probable cause to believe that defendant had
committed offense of driving without a license justified
arrest and search incident to arrest, even though officer
had decided not to arrest defendant for driving without a

14

license and did not form intent to arrest defendant until after discovering marijuana in passenger's purse, given that arrest occurred before traffic stop had ended), <u>cert</u>. <u>denied</u>, 126 S. Ct. 1480 (2006).

Because defendant was observed driving away from the residence once he saw police and weaving in his truck as he drove down the street, the police had reasonable suspicion that defendant was driving under the influence.  Therefore, the initial stop was lawful.  Once defendant admitted he had no driver's license, police had probable cause to arrest him for driving without a license.  When police observed him stumbling, saw that he had urinated on himself, and noticed that he smelled of alcohol, they had probable cause to arrest him for driving under the influence of alcohol. Therefore, the initial arrest of defendant was lawful.

**B.**	**SEARCH OF DEFENDANT'S TRUCK**

Under <u>New York v. Belton</u>, 453 U.S. 454, 460 (1981), "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile."  <u>See</u> <u>also</u> <u>Knowles v. Iowa</u>, 525 U.S. 113, 117-118 (1998).  The fact that the driver steps out of the vehicle before the police officer arrives does not alter his

15

status as an occupant of the vehicle. <u>Thornton v. United States</u>, 541 U.S. 615 (2004); <u>United States v. Orozco-Castillo</u>, 404 F.3d 1103; <u>United States v. Poggemiller</u>, 375 F.3d 686, 687 (8th Cir. 2004), <u>cert</u>. <u>denied</u>,544 U.S. 911 (2005). The lawfulness of the search does not depend on whether the occupant was actually capable of reaching the area during the course of the police encounter. <u>Belton</u>'s bright-line rule did away with that fact-specific inquiry into reachability, and <u>Belton</u> applies even after the arrestee has been taken into custody and removed from the scene. <u>United States v. Barnes</u>, 374 F.3d 601, 604 (8th Cir. 2004), <u>cert</u>. <u>denied</u>, 543 U.S. 1079 (2005); <u>United States v. McCrady</u>, 774 F.2d 868, 871-72 (8th Cir. 1985).

Although police are permitted to search a vehicle incident to arrest and that search does not need to be "during" the arrest, the search must be done "hard on the heels of the arrest". <u>United States v. Wells</u>, 347 F.3d 280, 287 (8th Cir. 2003), <u>cert</u>. <u>denied</u>, 541 U.S. 1081 (2004). In <u>Wells</u>, the arresting officer was quoted as follows:

> I went to the passenger door, opened the door from the outside. I asked Mr. Wells to step out. I believe I took control of one of his arms on the way out and handcuffed him. I drove the blue Pontiac four door that Mr. Wells was in to the northeast precinct to do an inventory search and to impound the vehicle. . . . It was going to be impounded and it's the standard

16

procedure to search.  Also, Mr. Wells was under arrest
at the time for marijuana that was found on his person.
Subsequent to his arrest the vehicle was searched.

Under those circumstances, the court found that the search
of the vehicle was not contemporaneous with arrest and
therefore, the search was not incident to arrest.

In this case, Special Agent Allen testified that
defendant's truck was driven back to his residence by a
police officer after defendant was placed in handcuffs.
According to Special Agent Allen, defendant was stopped and
placed in cuffs at approximately 7:00 a.m. (Tr. at 85), but
the truck was not searched until, at the very earliest,
10:40 a.m. (Tr. at 86-87).

Because the search of the truck did not come hard on
the heels of defendant's initial arrest, it was not
contemporaneous with his arrest and the search was therefore
not "incident to arrest".  Finally, police did not have
probable cause to believe anything illegal would be found in
defendant's truck.  Therefore, the search of the truck was
illegal and the two guns and magazines found inside the
truck should be suppressed.

## C.   *SEARCH OF DEFENDANT'S RESIDENCE*

Defendant argues that the police had no legal basis to
search defendant's home for identification, and therefore

17

the subsequent search warrant for the home is invalid because it is based on information obtained during the initial search for the identification.

**1.    *Initial entry into defendant's residence.***

Title 8, United States Code, Section 1357(a)(1) reads as follows:

(a) Powers without warrant

Any officer or employee of the [Immigration] Service authorized under regulations prescribed by the Attorney General shall have power without warrant--

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States[.]

In <u>United States v. Rodriquez</u>, 532 F.2d 834 (2nd Cir. 1976), an INS agent encountered a man sitting in a car outside of a house suspected of being used to harbor illegal aliens.  The agent asked the man if he was in the United States legally, and the man stated that he had come to the United States six years earlier as a tourist and that he had a passport.  The agent asked to see the passport, and the man stated that it was inside the house.  The agent told the man to go get it, and the agent followed the man in the house.  The man did not object to the agent's entry into the house.  The court held that the agent had a lawful right to follow the man into the house and to direct him to get his

18

passport.  The court's reasoning was that a tourist visa
would not still be valid after six years, so the agent had
probable cause to believe the man was in the country
illegally, and the passport would both substantiate that
fact and assist in deportation.

The facts of this case are nearly identical to those in
Rodriquez.  Here, an INS agent asked defendant for his
identification.  He gave the agent two different names, and
he stated that his identification was in his residence.  The
INS agent took defendant back to his residence and directed
him to go inside to retrieve the identification.  The agent
followed defendant inside the house.  Based on the sound
reasoning of United States v. Rodriquez, I find that the law
enforcement officers lawfully entered defendant's residence.

**2.   *Searching for the identification.***

Once lawfully inside the residence, the law enforcement
officers continued to ask defendant where his identification
was.  In addition, they continued to ask his name, and he
said only that his name was whatever was on his i.d.
Defendant said his identification was in his bedroom and
waved his hand in the direction of the bedroom.  That, along
with the fact that defendant never objected as Special Agent
Raggs went into the bedroom looking for the identification,

19

establishes that defendant impliedly consented to the cursory search of his residence for his identification.

In <u>United States v. Winston</u>, -- F.3d --, 2006 WL 1044180 (1st Cir., April 21, 2006), agents forced their way into Winston's home with an arrest warrant, approached him with weapons drawn, ordered him to drop his cell phone, handcuffed him with his hands behind his back, and did not advise him of his <u>Miranda</u> warnings.  The agents asked Winston for his identification.  Winston stated that his wallet was in the night stand in the bedroom.  The agents could not immediately locate the night stand in the bedroom, so they escorted Winston into the bedroom.  When asked again for the location of his identification, Winston indicated with a shoulder movement in the direction of the night stand.  The court of appeals held that this shoulder movement constituted implied consent to search the night stand for a wallet.

> While the agents did not explicitly ask for permission to open the drawer to retrieve Winston's identification, the circumstances described would reasonably lead the agents to conclude that Winston was consenting to the opening of the drawer in the night stand to allow for the retrieval of his wallet and identification.  Any other conclusion would allow Winston the benefits of sandbagging the agents into committing a violation of his rights.  Given the unquestioned facts, we see no reason why we should go along with such a deception.

20

The court of appeals reasoned that the same types of movements have been held to constitute implied consent to enter a residence.  For example, in United States v. Turbyfill, 525 F.2d 57 (8th Cir. 1975), police rang the doorbell of the defendants' home.  The officers identified themselves, and one of the defendants opened the inside door a few feet and stepped back.  The officers opened the unlocked screen door and entered the house.  The court held that "[a]n invitation or consent to enter a house may be implied as well as expressed.  There was no error in the determination of the district court that the action of [the defendant] in the opening of the door and stepping back constituted an implied invitation to enter." Id. at 59, citing Friedman v. United States, 381 F.2d 155 (8th Cir. 1967).  See also Pavao v. Pagay, 307 F.3d 915, 920 (9th Cir. 2002 (resident fully opened the front door and stepped back into the living room in response to request by police which is implied consent); United States v. Garcia, 997 F.2d 1273, 1281 (9th Cir. 1993) (implied consent when defendant opened his door and after the police said, "we'd like to talk to you," he said, "okay," nodded and stepped back); United States v. Griffin, 530 F.2d 739, 743 (7th Cir. 1976) (holding that despite the defendant's silence in response to

21

police questions about a possible burglary at his residence his conduct in stepping back and leaving the door open constituted consent to enter the home); Robbins v. MacKenzie, 364 F.2d 45, 48 (1st Cir.) (holding that a police officer who identifies himself and his purpose from the other side of a closed door has every reason to assume that the act of unlocking and opening the door, without more, is a consent to talk, and that the walking back into the room is an implied invitation to conduct the talking inside), cert. denied, 385 U.S. 913 (1966).

Therefore, because defendant impliedly consented to the search of his bedroom for his identification, Special Agent Raggs was lawfully in the bedroom when he saw the ledger with money numbers written on it.

Because the law enforcement officers lawfully entered defendant's residence and lawfully observed in plain view the ledger with money numbers -- information used to obtain a search warrant for defendant's residence -- the information in the affidavit in support of the search warrant was not unlawfully obtained, and defendant's motion to suppress on this basis should be denied.

*D.* ***SEARCH OF THE STORAGE LOCKER***

Defendant next argues that the search of the storage locker was unlawful because Ms. Wilkerson's consent was not valid as the police knew the locker was used exclusively by defendant. This argument is without merit.

In <u>United States v. Klotz</u>, 943 F.2d 707, 709 (7th Cir. 1991), police came across records showing that a storage unit was rented to the suspect's wife. Police went to talk to the wife, and she expressed surprise that the lease was current. Apparently the defendant had made subsequent payments extending the least without his wife's knowledge. Acting on her consent, agents opened the unit and recovered a kilogram of cocaine. The defendant complained that his wife lacked authority to give permission, but the court of appeals disagreed.

> Either actual or apparent authority will do. <u>Illinois v. Rodriguez</u>, 497 U.S. 177 (1990). Teigen [the defendant's wife] was the lessee. . . . If the lessor had cleaned out the locker on March 1, 1990, before the expiration of the final extension, Teigen would have been the right person to obtain relief. She was therefore also the right person to give consent.

The same is true here. Ms. Wilkerson's name was the only name on the rental contract for the storage unit. She had the option of authorizing others to have access to the unit, but she chose to leave that portion of the rental

23

contract blank.  Therefore, Ms. Wilkerson was the only
person legally entitled to give consent to the search of
that storage locker.  As the court noted in <u>Klotz</u>, "Police
are not obliged to believe convenient disclaimers
inconsistent with documents in hand."  <u>Id</u>.  In this case,
police were not obliged to believe that defendant was the
"only real lessee" of the storage unit, which was
inconsistent with the rental agreement which showed that Ms.
Wilkerson was the only legal lessee.

Therefore, because (1) police lawfully searched
defendant's residence where the information about the
storage unit was found, and (2) Ms. Wilkerson provided valid
consent to search the storage unit, defendant's motion to
suppress the items found inside the storage unit should be
denied.

### IV.  CONCLUSION

Based on the above-stated findings of fact and the law
as discussed in section III, I conclude that the law
enforcement officers lawfully stopped defendant, lawfully
detained defendant, lawfully entered defendant's residence,
lawfully searched for his identification, and lawfully
searched the storage locker.  I further find that the search
of defendant's truck was not incident to arrest, and that no

24

other exception to the warrant requirement exists.
Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress evidence found in his residence and the storage unit, and grant defendant's motion to suppress the items found in his truck.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
May 8, 2006

Case 4:06-cr-00102-DW   Document 33   Filed 05/08/06   Page 25 of 25